**UNITED STATES DISTRICT COURT**
**MIDDLE OF LOUISIANA**

**BRUCE R. GREENE**

           **Plaintiff,**

    **v.**                                **CIVIL NO. 3:21-CV-128**

**MAMMOET USA SOUTH, INC. and**
**ANTHONY GARCIA**

           **Defendants.**

**COMPLAINT**

Plaintiff Bruce R. Greene asserts his causes of action against defendants Mammoet USA South, Inc. and Anthony Garcia as follows:

**THE PARTIES**

1.    Plaintiff is Bruce R. Greene, a person of age and majority, who is a citizen of Louisiana and resident of St. Tammany Parish.

2.    Defendant is Mammoet USA South, Inc. (hereinafter "Mammoet"), a foreign corporation organized and registered in Delaware, headquartered in Texas (and which is also registered and actively doing business in Louisiana).  Thus, Mammoet is upon information and belief a citizen of Delaware and Texas.

3.    Defendant is Anthony Garcia, a person of age and majority, who upon information and belief is a citizen and resident of Texas.

**JURISDICTION AND VENUE**

4.    The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), 42 U.S.C. §§ 2000e-2 *et seq*. (Title VII), and 42 U.S.C. § 1981 *et seq*. (discrimination in contracts based on race), as more particularly set-out herein.

1

5.     The Court has supplemental, subject-matter jurisdiction over Mr. Greene's Louisiana state law claims pursuant to 28 U.S.C. § 1367(a) because the state-law claims are so related to his federal law claims that they form part of the same case or controversy as more particularly set-out herein.

6.     Additionally or alternatively, the Court has subject-matter jurisdiction over Mr. Greene's Louisiana state law claims pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), as the damages alleged by plaintiff further herein exceed the jurisdictional amount of $75,000 and there is complete diversity of citizenship between the plaintiff and both defendants.

7.     The Court has personal jurisdiction over Mammoet because it is a corporation registered in Louisiana with the Louisiana Secretary of State and, through its registered agent for the service of process, is present within Louisiana at the time this suit commenced.

8.     Alternatively, the Court has personal jurisdiction over Mammoet as it regularly transacts business in Louisiana and regularly employs Louisiana citizens, maintains brick and mortar places of business in Louisiana, committed unlawful employment acts within Louisiana which gave rise to the causes of action in this case (or were directed towards an employee working in Louisiana), and derives substantial revenue from the services it provides in Louisiana.  Thus, Mammoet has established minimum specific contacts with Louisiana, arising from the facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

9.     The Court has personal jurisdiction over Anthony Garcia as he committed the unlawful employment acts giving rise to this case against a Louisiana citizen physically located and employed in Louisiana, and Mr. Garcia committed these unlawful acts while he was teleconferencing with Mr. Greene who was physically located and employed in Louisiana, and thus has established minimum specific contacts with Louisiana, arising from the facts of this case,

comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

10.    Venue for Mr. Greene's Title VII claims are proper in this Court pursuant to 42 U.S.C. § 2000e–5(f)(3) (Title VII's venue provision) because (1) the unlawful employment practices alleged herein were committed in Louisiana within this judicial district (or were directed towards an employee working in Louisiana)  (specifically Iberville Parish), (2) Mr. Greene would be employed in this judicial district (same) but for his discriminatory termination, and (3) upon information and belief the employment records relevant to this action are found within this judicial district (same).

7.    Venue for Mr. Greene's Section 1981 and supplemental state-law claims are proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all defendants' unlawful acts, as well as Mr. Greene's resulting injuries and damages, giving rise to this lawsuit occurred within this judicial district (specifically, Iberville Parish) and, accordingly, a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

**PROCEDURAL AND STATUTORY REQUIREMENTS**

8.    At all relevant times, Mammoet employed more than 500 employees.

9.    On or about June 10, 2010, Mammoet hired Mr. Greene as a Safety, Health, Environment, and Quality Advisor ("SHE-Q Advisor").

10.    Mr. Greene had been continuously employed by Mammoet from June 10, 2010 until his termination on June 20, 2020.

11.    Upon information and belief, Mr. Garcia and Mammoet terminated Mr. Greene's employment because of his race, sex, religion, and in retaliation for his participation in protected political activities, or alternatively because of a disparately impacting policy, custom, or practice

used by Mammoet that had the effect of discriminating against Mr. Greene based on his race, sex, or religion, and in retaliation for his participation in protected political activities.

12.    On or about October 23, 2020, within 300 days of his termination and last adverse employment action, Mr. Greene timely filed an EEOC Charge of Discrimination with the EEOC New Orleans Field Office alleging that Mammoet unlawfully discriminated against and terminated Mr. Greene based on his race, sex, religion, and in retaliation for his participation in protected political activities, in violation of Title VII, or alternatively that Mammoet used a disparately impacting policy, custom, or practice that had the effect of discriminating against Mr. Greene because of his race, sex, religion, and in retaliation for his participation in protected political activites (EEOC No. 461-2021-00175).

13.    On December 2, 2020, the EEOC issued Mr. Greene a Notice of Right to Sue in this matter.

14.    Mr. Greene timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

**A.    The Plaintiff — Bruce Greene**

15.    Bruce Greene is a 49-year-old husband and father who lives with his wife and three of his minor children in Madisonville, Louisiana.  Mr. Greene is a white man who identifies as a Christian.

16.    Mr. Greene began his career with Mammoet as a SHE-Q Advisor on June 10, 2010.

17.    During his decade long career with Mammoet, Mr. Greene never received written discipline.

18.    Mr. Greene has only ever received a single instance of documented, verbal counseling approximately six years ago.

19.    Mammoet terminated Mr. Greene's employment on or about June 20, 2020.

**B.    The Defendants — Mammoet USA South, Inc. & Anthony Garcia**

20.    Mammoet USA South, Inc. is a regional subsidiary of the international, privately held company, Mammoet.

21.    Mammoet USA South, Inc. ("Mammoet") is a business corporation organized in Delaware in 1993, with its principal place of business in Rosharon, Texas.

22.    At all relevant times, Mammoet employed more than 500 employees.

23.    At all relevant times, Mammoet owned and operated a physical place of business located St. Gabriel, Louisiana.

24.    The place of business in St. Gabriel was the primary location Mr. Greene was employed at and where he performed most of his work-related responsibilities.

25.    Mr. Anthony Garcia is the Vice President and a Regional Board Member of Mammoet North America.

26.    Upon information and belief, Mr. Garcia was the ultimate decision-maker who decided to terminate Mr. Greene's employment with Mammoet.

**C.    Mr. Greene Discusses Politics with an Acquaintance on Social Media While on Approved Vacation**

27.    In or around late June 2020, Mr. Greene took approved vacation leave.

28.    While on vacation, using his own, personal, digital device, Mr. Greene participated in a political discussion with a former high school teacher of his on Facebook, R.B. (black, male).[1]

29.    R.B. hosted the debate on his Facebook profile page and framed the conversation as a

---

[1]    Plaintiff refers to witnesses in this matter using only their initials to protect their privacy in this publicly filed document. Plaintiff will supplement with the full name of each witness during discovery.

forum to specifically discuss the topics of race, racism, policing, and police funding in the United States today.

30.     Mr. Greene and R.B. exchanged several comments on the subjects, but the debate remained respectful: no one used profanity, there were no attacks on anyone's character, and no one engaged in bullying or harassment of any sort.

31.     Upon information and belief, Mr. Greene in no way engaged in any behavior or communication that violated Mammoet's social media use policy.

32.     At all times, Mr. Greene was engaging in this political activity while acting in his individual capacity, without identifying himself as an employee of Mammoet, while using his personal digital devices, and during approved vacation time.

33.     Mr. Greene did not harass, bully, or intimidate anyone online.

38.     Mr. Greene publicly advocated a political position against the idea of "defunding" the police in a conversation specifically created to discuss that political topic in the public space.

**D.     Mammoet Receives a Complaint and Investigates**

34.     On or about June 30, Mammoet's local human resources officer, O.L. (white, male), contacted Mr. Greene and advised him that a non-employee had contacted Mammoet and complained that he or she was offended by Mr. Greene's public political discussion with R.B.

35.     O.L. told Mr. Greene he had been assigned to investigate the matter.

36.     O.L. told Mr. Greene he was "under investigation by HR for a racist post you posted on FB, do you want to discuss it or say anything in your defense," implying to Mr. Greene that he was being investigated for his political views on defunding the police in wake of the George Floyd protests.

37.     Mr. Greene took very seriously the allegation that he had engaged in any form of race-

based animus whatsoever, immediately denied the allegation, and fully cooperated in Mammoet's investigation.

38.    Mr. Greene strongly denied any misconduct whatsoever throughout the investigation.

39.    Mr. Greene sent O.L. additional communications adding background context to his political discussion with R.B., including sources for the information he cited as part of the public discussion.

40.    Included in those text messages were details concerning Mr. Greene's Christian faith and his involvement in teaching a blended-family dynamics workshop at his family's church.

41.    A Mammoet co-worker and close friend of Mr. Greene, R.P. (black, male), called Mammoet's Human Resources department and indicated he had never known Mr. Greene to engage in any racially inappropriate behavior towards anyone, ever.

45a.    O.L. then called Mr. Greene and admonished him that the investigation was confidential and not to speak to anyone else about it.

42.    Mr. Greene specifically asked O.L. to interview Mr. Greene's colleagues and friends at Mammoet who themselves were people of color to investigate and determine whether or not Mr. Greene ever actually engaged in any inappropriate or racist behavior in the workplace or his personal life.

43.    Upon information and belief, O.L. did not interview any of Mr. Greene's colleagues.

44.    Upon information and belief, Mr. Greene does not know of any other of his online activity or speech that could have influenced Mammoet's termination decision besides the content of the single Facebook political debate Mr. Greene had with R.B.

48a.    Subsequent to his termination, Mr. Greene communicated again with R.B., and R.B. denied that he was the non-employee who contacted Mammoet to complain about Mr. Greene's political

speech.

48b.    R.B. denied that he perceived anything about Mr. Greene's political speech as racist or insensitive to race.

48c.    After learning that Mammoet terminated Mr. Greene's employment based on Mr. Greene's political speech, R.B. contacted Mammoet and requested that Mr. Greene be reinstated to his former position.

**E.    Mammoet Terminates Mr. Greene Because of His Public Political Activities in Combination with His Race, Sex, and Religion**

45.    On June 20, 2020, Mr. Greene was summoned to Mammoet's corporate office in St. Gabriel, Louisiana.

46.    Mr. Greene's branch manager, Stuart Cloutre was physically present, and Mammoet's Human Resources Manager, Victoria Hilgers, and Vice President Anthony Garcia participated in the meeting by teleconference.

50a.    Before the teleconference began, Mr. Cloutre told Mr. Greene "man, I hate this so bad for you."

50b.    Mr. Greene observed an open email from Mr. Garcia to Mr. Cloutre entitled "employee separation," specifically regarding Mr. Greene.

50c.    Mr. Greene therefore knew that Mammoet had determined to terminate his employment prior to the start of the meeting.

47.    When the meeting began, Mr. Garcia spoke plainly and stated Mammoet determined that Mr. Greene had "damaged" the "reputation of the company" because of his political activity on social media.

51a.    Mr. Garcia said "we [meaning Mammoet] can no longer move forward together."

48.    Mr. Garcia indicated that, effective immediately, Mammoet terminated Mr. Greene's

8

employment.

49. Mr. Garcia then directed Mr. Greene to sign a document indicating he "resigned" and stated that even if he refused to sign the document, his termination would still be effective.

50. Mr. Garcia, on behalf of Mammoet, also offered to pay Mr. Greene $18,293.61 if he signed a release promising never to sue Mammoet for employment discrimination, unlawful termination, libel, or slander (among other things).

54a. Mr. Greene rejected the unilateral settlement offer because he believed he had committed no misconduct whatsoever.

51. After Mr. Greene's termination, multiple Mammoet employees and managers stated to Mr. Greene that they did not agree with the termination.

52. Upon information and belief, Mr. Garcia previously sought the counsel of an outside law firm when considering the termination of Mr. Greene, although it is unknown what advice was given, or if Mr. Garcia followed or rejected the advice.

56a. Upon information and belief, at the time Mr. Garcia terminated Mr. Greene's employment, Mr. Garcia knew that his actions violated Title VII and the Louisiana Employment Discrimination Law, but Mr. Garcia persisted to unlawfully terminate Mr. Greene's employment anyway.

56b. Upon information and belief, at the time Mr. Garcia unlawfully terminated Mr. Greene's employment, Mr. Garcia did so with Mammoet's full authorization and direction, and within the ordinary course and scope of Mr. Garcia's duties as Mammoet's vice-president.

53. In any event, upon information and belief, and considering all the facts and circumstances known to Mr. Greene at the time, Mr. Garcia and Mammoet's decision to terminate Mr. Greene for "damaging" Mammoet's "reputation" by engaging in a public social media political activity regarding defunding the police was merely pretext, and that the real reason for Mr. Greene's

termination was because of his political speech and activities in combination of his race (white), sex (male), and religion (Christian).

67a.    Alternatively, upon information and belief, Mammoet actually has a policy, custom, or practice to discipline or terminate its employees who express certain political opinions or engage in certain political activity on social media but only when those employees are white, men, or Christian, and that policy was applied against Mr. Greene and resulted in his termination.

54.    In other words, upon information and belief, and considering all the facts and circumstances known to Mr. Greene at the time, Mr. Greene would not have been terminated had Mr. Greene engaged in the exact same public political activities, but-for his race, sex, and religion.

**F.    Mammoet's Policies, Customs, or Practices Disparately Impacted Mr. Greene Based on His Race, Sex, and Religion**

55.    Upon information and belief, Mammoet maintains a policy, custom, or practice that disparately impacted Mr. Greene.

56.    First, Mammoet maintains a "Social Media Policy" that prohibits any employee from posting any material that "could damage the company's reputation."  Second, upon information and belief, Mammoet only investigates their employees' social media activity or compliance with Mammoet's Social Media Policy if the company receives complaints from employees or third-parties regarding posted content, and then Mammoet selectively enforces their Social Media Policy solely based on the subjective attitudes of Mammoet's decision-makers without any objective or other non-discriminatory policies or criteria whatsoever.

57.    Upon information and belief, Mr. Greene was targeted by a third-party in this case because of Mr. Greene's political activity and because he is white, male, Christian, or a combination of the above.

58.    Upon information and belief, the only complaints Mammoet receives regarding social

media political discussions are complaints against employees who appear to be white, male, or Christian.

59.     Accordingly, to the extent that Mammoet's Social Media Policy is selectively enforced based on the complaints the company receives from third-parties; and to the extent Mammoet then enforces its Social Media Policy based solely on the subjective determination of decision-makers without regard to any objective or other non-discriminatory policies or criteria; then upon information and belief Mammoet's policy, custom, or practice regarding social media may be neutral on its face, but, as applied, actually produces the disparate result that only (or predominantly) white, male, or Christian employees are investigated, disciplined, or terminated for their political activities and writings conducted on social media as compared to identical conduct by employees outside of Mr. Greene's protected classes.

60.     Upon information and belief, many other employees at Mammoet openly discuss their political beliefs on social media.

65a.     Upon information and belief, many of these opinions expressed by other Mammoet employees appear to be openly and actually biased against other people and groups based on their race, sex, national origin, sexual preference, and other protected statuses, and would otherwise violate Mammoet's Social Media Policy.

61.     Upon information and belief, at least some of these other employees who make these sorts of biased comments on social media platforms are people outside of Mr. Greene's protected classes.

62.     Upon information and belief, because these employees have not been targeted by third-parties because of their race, sex, or religion, Mammoet has not investigated them, and thus no disciplinary action has been taken against them.

67a.    Additionally or alternatively, upon information and belief, these other employees have in fact been investigated by Mammoet; Mammoet's policy, custom, or practice is to enforce its social media policies based solely on the subjective judgment of its decision-makers without regard to any objective or otherwise non-discriminatory policy or criteria; and these decision-makers actually exercise their subjective judgment in a disparately impacting manner, such that employees who are white, male, or Christian are disproportionately disciplined or terminated based on their political speech and activities as opposed to those employees outside those protected classes.

67b.    Additionally or alternatively, upon information and belief, Mammoet's Social Media Policy's prohibition of positing any content that "could damage the company's reputation," though neutral on its face, is actually a proxy to coerce and intimidate employees from posting political content on social media that many might consider to be "conservative" in nature under threat of discipline or termination, and Mammoet further uses the Policy as pretext to justify the termination of employment of employees who engage in such political activity, or post such political writing to social media, and who are white, Christian, or men.

**G.    The Aftermath**

63.    After Mammoet terminated Mr. Greene, he lost his employment, benefits, and pay.

64.    While Mr. Greene eventually found alternative employment, the employment paid less than his work at Mammoet, provided no benefits, and Mr. Greene was required to travel out of state for long periods of time, on the road, and could not see his family or children, including his oldest daughter in her final year of high school, and Mr. Greene's stress, anxiety, and loss of enjoyment of life has been extraordinary.

65.    One of Mr. Greene's children also contracted COVID-19 while he was away working on the road, and Mr. Greene could not care for his daughter, causing him further, extraordinary fear,

stress, anxiety, worry, and loss of enjoyment of life.

66.     Because Mammoet unlawfully terminated Mr. Greene's employment under the pretext that Mr. Greene engaged in race-based animus on social media, Mr. Greene's credibility and professional and personal reputation have been significantly diminished, leading further to Mr. Greene's stress, worry, mental anguish, and loss of enjoyment of life.

67.     Mr. Greene has suffered significant out of pocket expenses during his unemployment and on-the-road re-employment in the midst of a global pandemic.

68.     Accordingly, specifically because of Mammoet and Anthony Garcia's unlawful termination decision in this case, Mr. Greene is out significant lost back wages, lost future wages, the value of lost benefits, out-of-pocket expenses, reasonable attorney fees incurred because of defendants' unlawful discrimination and termination, and reasonable litigation costs incurred in this matter, and Mammoet and Mr. Garcia are liable to Mr. Greene for those damages.

73a.    Because Mammoet and Mr. Garcia willfully and purposefully terminated Mr. Greene's employment in violation of Title VII, Mammoet and Mr. Garcia also owe Mr. Greene punitive damages in this matter.

## CAUSES OF ACTION

**A.     Unlawful Disparate Treatment and Disparate Impact Discrimination Based on Race, Sex, and Religion under Title VII Against Mammoet USA South, Inc.**

69.     Mr. Greene states a cause of action for unlawful disparate-treatment discrimination and disparate-impact discrimination based on his race (white), sex (male), and religion (Christian), against Mammoet under Title VII.

70.     Pursuant to Title VII of the Civil Rights Act of 1964 (as amended), an employer may not discriminate against any "individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color . . . sex, or national origin[.]" 42 U.S.C.

§2000e-2(a)(1).    An employer illegally demotes, terminates, or constructively discharges an employee based on his protected status when the status is at least one of the factors motivating the adverse action.  *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).  In a Title VII action, an employer is vicariously liable for its decision-maker's discriminatory acts when the decision-maker serves as the employer's agent, or when the employer knew or should have known of the decision-maker's discriminatory conduct and took no remedial action. *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

71.    Alternatively, "[s]tatistical evidence is also of central importance in a disparate treatment case[,]" and an employee may prove his prima facie case statistically "if gross statistical disparities in the composition of an employer's work force can be shown." *Pouncy v. Prudential Ins. Co. of Am.*, 668 F.2d 795, 802 (5th Cir. 1982).  Specifically, when "the statistical showing is sufficiently strong in a disparate treatment action, [an employee's] prima facie case can be made without additional evidence establishing that defendant purposefully treated minorities protected under Title VII less favorably than other persons." *Id.*  "If statistical evidence is insufficient to establish discriminatory intent, [employees] may bolster their case by introducing historical, individual, or circumstantial evidence." *Anderson v. Douglas & Lomason Co., Inc.*, 26 F.3d 1277, 1285 (5th Cir. 1994).

72.    When direct evidence of discrimination is not available, an employee may prove his case with circumstantial evidence that he "(1) is a member of a protected class; (2) was qualified for the position; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or in the case of disparate treatment, shows that other similarly situated employees [not in the protected class] were treated more favorably." *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004).

73.     In a Title VII, disparate-treatment action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action.  *See e.g.*, *Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1235 (5th Cir. 1989).

78a.    Alternatively, Title VII forbids an employer from using "a practice that causes disparate impact, whatever the employer's motives and whether or not he has employed the same practice in the past." *Lewis v. City of Chicago, Ill.*, 560 U.S. 205, 217 (2010); *cf.* 42 U.S.C.A. § 2000e-2(k)(1) *et seq.* (so providing).  Specifically, in a disparate impact action, proof of discriminatory motive is not required.  *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006).  A prevailing plaintiff need only prove that a policy, custom, or practice, even if factually neutral, has a disproportionately adverse effect on such a protected group.  *Id*.  When a defendant's employment actions are based on either a combination of objective criteria plus subjective decision making, or based solely on subjective decision making with no other objective criteria, "the decision making process [itself] may be analyzed as one employment practice." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 276 (5th Cir. 2008).

74.     Here, Mr. Greene realleges and incorporates by reference each and every allegation in the aforementioned paragraphs of this Complaint as if fully set forth herein.

75.     In this case, Mr. Greene engaged in political activity on social media while on vacation, while using his own, private digital device, without identifying himself as a Mammoet employee, and with a personal acquaintance who invited others to join in a political discussion on police funding in the wake of George Floyd's killing by police in the summer of 2020.  Mr. Greene did not bully, harass, or threaten anyone.  Mr. Greene did not engage in any activity that evinced racial animus or insensitivity.  Mr. Greene did not demean anyone based on their race or other protected

status.  Mr. Greene debated for the political and policy position that police departments ought not be "defunded" as the term was colloquially used at the time.  Mammoet later admitted to Mr. Greene that a non-employee complained about Mr. Greene's political activity to Mammoet, and Mammoet, though its human resources employee, alleged that Mr. Greene's social media political activity was racist or evinced race-based animus.  Mr. Greene immediately denied the allegation and fully cooperated with Mammoet's investigation.  Upon information and belief, Mammoet produced no evidence during its internal investigation that led decision-makers to believe that Mr. Greene's political activity on social media either violated Mammoet policy or was actually racist or evinced racial animus.

80a.    Instead, upon information and belief, Mammoet decision-makers, specifically including its human resources employees and its vice-president, Anthony Garcia, knew that Mr. Greene was a white, Christian, man, and Mammoet determined that it would not tolerate employees who were white, Christian, or men advocating for what many might describe as a "conservative" political position on social media platforms.  Alternatively, upon information and belief, Mammoet actually maintained some policy, custom, or practice that directed discipline or termination of employees who engaged in such political activities on social media platforms and who were white, Christian, or men.  Because Mr. Greene was, in fact, a white, Christian, man, Mammoet, its human resources employees, and Mr. Garcia terminated Mr. Greene's employment.  In other words, upon information and belief, had Mr. Greene not been white, a Christian, or a man, then Mammoet, its human resources employees, and Mr. Garcia would not have terminated Mr. Greene under the circumstances of this case.

80b.    Additionally, upon information and belief, Mammoet, through its human resources employees and Mr. Garcia, willfully and purposefully terminated Mr. Greene's employment in

violation of Title VII despite understanding that their termination decision was unlawful.

76.    Alternatively, Mammoet had at all relevant times in this lawsuit some custom, policy, or practice that, although facially neutral, had the disproportionately disparate impact of investigating, disciplining, or terminating employees who are white, Christian, or men because they participated in political activities and political speech through social media.    Upon information and belief, Mammoet, through its decision-makers, knew that its policy, custom, or practice had the effect of disproportionately resulting in the termination of employees based on their race, sex, or religion, but maintained the policy anyway.

77.    More specifically, upon information and belief, Mammoet's Social Media Policy, or some other policy, custom, or practice, was to only investigate their employees social media and political activities when another employee or third-party makes a complaint about that content; then, after review, Mammoet's Social Media Policy, or some other policy, custom, or practice, was to discipline or terminate the employee based solely on the subjective judgment of a decision-maker without regard to any other objective or otherwise non-discriminatory policy or consideration. Upon information and belief, the subjective judgment of Mammoet's decision-makers disproportionately results in termination of white, Christian, men versus others outside those protected classes who also engage in political activities on social media.    Because Mammoet's disciplinary process depends exclusively on the subjective judgment of Mammoet's decision-makers, the entire process of investigating, disciplining, and terminating employees who engage in political activities on social media is considered one, single employment practice by Mammoet. Ultimately, in this case, upon information and belief, had either Mammoet not maintained the policy, practice, or custom alleged above; or, had Mr. Greene not been white, Christian, or a man, he would not have been terminated despite his political activity on social media.

78.    Accordingly, under plaintiff's disparate treatment claim of unlawful termination in this case, Mammoet is liable, both directly and vicariously through their owners, managers, and employees, for all actual and statutory damages suffered by Mr. Greene resulting from his unlawful termination, including, but not limited to, back pay, front pay or reinstatement, punitive damages, compensatory damages, non-compensatory damages, mental anguish damages, loss of enjoyment of life damages, legal costs, pre-judgment and post-judgment interest, reasonable attorney's fees incurred in this action, and all other appropriate, equitable relief.

85a.    Accordingly, under plaintiff's disparate impact claim of unlawful termination in this matter, Mammoet is liable to Mr. Greene for his lost back wages, lost front wages or reinstatement, pre-judgment and post-judgment interest, costs, and reasonable attorney's fees incurred in this action, and all other appropriate, equitable relief.

**B.    Unlawful Disparate Treatment and Disparate Impact Discrimination Based on Race, Sex, and Religion under the Louisiana Employment Discrimination Law Against Mammoet USA South, Inc.**

79.    Mr. Greene states a cause of action for unlawful disparate-treatment discrimination and disparate-impact discrimination based on his race (white), sex (male), and religion (Christian) against Mammoet under the Louisiana Employment Discrimination Law (as amended).

80.    Under the LEDL, no employer may discriminate against an employee based on his race, color, religion, or sex. La. Rev. Stat. Ann. § 23:332 *et seq.* Louisiana's anti-discrimination statute is modeled after Title VII, and therefore analysis of the two statutes are functionally identical.  The LEDL permits a plaintiff to prove unlawful discrimination under a claim of disparate impact discrimination.  *Adams v. United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U.S. & Canada, AFL-CIO, Local 198*, CV 98-400-JWD-RLB, 2020 WL 6074627 at *5 (M.D. La. Oct. 15, 2020) (so holding and citing to *Lee v. Constar, Inc.*, 05-633 (La.

App. 5th Cir. 2/14/06), 921 So. 2d 1240, 1247 (holding that discriminatory intent is "not required" under Louisiana law)).

81.     Accordingly, for all the reasons stated throughout this complaint, and specifically incorporating the analysis of plaintiff's claims of unlawful disparate-treatment discrimination and unlawful disparate-impact discrimination under Title VII against Mammoet, Mammoet is likewise liable to Mr. Greene for all his damages arising from Mammoet's unlawful disparate-treatment discrimination and unlawful disparate-impact discrimination, including, but not limited to, lost back wages, lost front wages or reinstatement, compensatory damages, non-compensatory damages, mental anguish and loss of enjoyment of life damages, legal costs, pre-judgment and post-judgment interest, Mr. Greene's reasonable attorney's fees and actual costs incurred in this action, and all other appropriate, equitable relief.

**C.      Unlawful Disparate Treatment Discrimination Based on Race under 42 U.S.C. § 1981 Against Mammoet USA South, Inc. and Anthony Garcia in his Individual Capacity**

82.     Mr. Greene states a cause of action for unlawful disparate-treatment discrimination based on his race (white) and color (white) against Mammoet and Anthony Garcia under 42 U.S.C. § 1981.

83.     Pursuant to Section 1981 of the Civil Rights Act of 1866 (as amended), "all persons in the United States shall have the same contractual rights" and an employer may not discriminate against its employees on the basis of their race. *See LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir. 1996) (citing 42 U.S.C. § 1981(a)). Whether an employer violates Section 1981 is determined under the same analysis as a Title VII claim.    *LaPierre*, 86 F.3d at 448. In a Section 1981 action, an employer is vicariously liable for its manager's discriminatory acts when the manager serves as the employer's agent, or when the employer knew or should have known of the manager's discriminatory conduct and took no remedial action. *Arguello v. Conoco, Inc.*, 207 F.3d 803, 807

(5th Cir. 2000).

84.     In a Section 1981 action, the individual decision-maker who purposefully engages in racially discriminatory acts or retaliation, although not the victim's actual employer, is liable under Section 1981.  *See Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 381 (5th Cir. 1988).

85.     The framework for determining Mammoet and Mr. Garcia's liability under Section 1981 for Mr. Greene's unlawful termination claim based on race discrimination is identical to that used under Title VII.

86.     Plaintiff hereby incorporates and re-alleges here all prior allegations in this Complaint.

87.     Further, and more specifically, upon information and belief, based on all the facts and circumstances and Mr. Greene currently understands them, Mr. Garcia was the final and actual decision maker who terminated Mr. Greene's employment with Mammoet; Mammoet either authorized or knew of Mr. Garcia's termination decision; and both Mammoet and Mr. Garcia determined to terminate Mr. Greene's employment because he advocated for what many might describe as a "conservative" political position on social media platforms and was white.  In other words, upon information and belief, and based on all the facts and circumstances as Mr. Greene currently understands them, Mammoet and Mr. Garcia would not have terminated Mr. Greene's employment in this matter had he not been white.

88.     Accordingly, pursuant to Section 1981 of the Civil Rights Act of 1866 (as amended) Mammoet and Anthony Garcia are jointly and severally liable for all actual and statutory damages suffered by Mr. Greene resulting from his discriminatory termination, including, but not limited to, back pay, front pay or reinstatement, punitive damages, compensatory damages, non-compensatory damages, mental anguish and loss of enjoyment of life damages, legal costs, pre-judgment and post-judgment interest, Mr. Greene's reasonable attorney's fees and actual costs

incurred in this action, and all other appropriate, equitable relief.

**D.    Unlawful Termination for Political Activity under La. Rev. State. Ann. § 23:961 Against Mammoet USA South, Inc.**

89.    Mr. Greene states a cause of action for unlawful termination based on his political activities and speech under Louisiana Revised Statute § 23:961.

90.    Louisiana state law prohibits any employer with 20 or more employees from making or enforcing any rule or policy "forbidding or preventing any of his employees from engaging or participating in politics[.]" La. Rev. Stat. Ann. § 23:961.   Section 23:961 likewise forbids any employer from coercing, influencing, or attempting to coerce or influence any employee from participating "in political activities of any nature or character." *Id.*   In a civil action, an employee unlawfully terminated because of his political activities is entitled to recover "damages from the employer as a result of suffering caused by the employer's violations of [Section 23:9610]." *Id.*

91.    Under Section 23:961, an employer who terminates an employee for engaging in political activity necessarily "develop[s] a proscribed policy as a result of [the activity]" in violation of the statute.   *Davis v. La. Computing Corp.*, 394 So.2d 678, 679-80 (La. Ct. 4 App. 1981).   Under Section 23:961, an employer's legitimate business justification or potential loss of customers does not provide an exception to liability.   *Id.*

92.    Plaintiff hereby incorporates and re-alleges here all prior allegations in this Complaint.

93.    In this case, Mammoet maintained a "Social Media Policy" that prohibited any employee from engaging in activity that "could damage the company's reputation."   Upon information and belief, this Policy was actually used as a proxy to coerce and intimidate employees from posting political content on social media that many might consider to be "conservative" in nature under threat of discipline or termination, and Mammoet further used the Policy as pretext to justify the termination of employment of employees who engaged in such political activity, or posted such

21

political writing to social media.

100a.   In fact, Mammoet's human resources employees expressly told Mr. Greene that he was under investigation because of his political writings posted to social media.  Although Mammoet described the allegation against Mr. Greene as engaging in racially charged commentary, or commentary evincing race-based animus, upon information and belief this was merely untrue pretext, and Mammoet simply preferred against employing any person who might be publicly or internally perceived to be expressing what some might describe as a "conservative" political position on social media platforms, particularly on topics relating to police funding in the aftermath of George Floyd's killing by police officers in the summer of 2020.

100b.   Then, during his termination meeting with Mammoet decision makers, Mammoet vice president Anthony Garcia admitted to Mr. Greene that Mammoet's decision to terminate his employment was, in fact, in violation of Mammoet's Social Media Policy based on the content of Mr. Greene's political writings posted to social media because those writings "damaged" the "reputation of the company."  Although Mammoet may have perceived that Mr. Greene's political writings "damaged" the company's reputation, Section 23:961 does not permit an employer to terminate an employee based on his political activities merely because the employer asserts the political activities might cause a potential loss of customers or otherwise constitutes a business necessity.  *Davis*, 394 So.2d at 679-80.

100c.   Accordingly, Mammoet, through its vice president, has directly admitted to liability under Section 23:961 as a matter of law for maintaining a Social Media Policy that upon information and belief was designed to coerce and intimidate employees from engaging in particular political activities, and for terminating Mr. Greene's employment based on his political activities.

94.   Accordingly, pursuant to La. Rev. State. Ann. § 23:961, Mammoet is liable for all damages

suffered by Mr. Greene resulting from his discriminatory termination, including, but not limited to, lost back wages, lost front wages, compensatory damages, non-compensatory damages, mental anguish damages, loss of enjoyment of life damages, legal costs, pre-judgment and post-judgment interest, and any other relief to which Mr. Greene is entitled.

### JURY DEMAND

Mr. Greene demands a trial by jury on all issues and causes of action in this matter.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Bruce Greene prays that his complaint be deemed good and sufficient; that it summons be served upon defendants Mammoet USA South, Inc. and Anthony Garcia; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendants (1) declaring that defendants did intentionally discriminate against plaintiff based on his race, sex, or religion and because of his protected political activities and speech, or as a result of a disparately impacting policy, custom, or practice; (2) awarding Mr. Greene legal relief with respect to plaintiff's claims under Title VII and 42 U.S.C. § 1981 for disparate treatment discrimination up to and including lost back wages, lost front wages or reinstatement, compensatory damages, non-compensatory damages, statutory damages (under Title VII) punitive damages, litigation costs, pre-judgement and post-judgment interest, and Mr. Greene's reasonable attorney's fees incurred in the matter; (3) awarding Mr. Greene legal relief with respect to plaintiff's claims under Title VII for disparate impact discrimination up to and including lost back wages, lost front wages or reinstatement, any other equitable relief to which Mr. Greene may be entitled, litigation costs, pre-judgement and post-judgment interest, and Mr. Greene's reasonable attorney's fees incurred in the matter; (4) awarding Mr. Greene legal relief with respect to plaintiff's claims under the Louisiana Employment Discrimination Law for disparate treatment

and disparate impact discrimination, and for plaintiff's claims under La. Rev. State. Ann. § 23:961 for political activities retaliation, up to and including lost back wages, lost front wages (or reinstatement under the LEDL), compensatory damages, non-compensatory damages, litigation costs, pre-judgement and post-judgment interest, and Mr. Greene's reasonable attorney's fees incurred in the matter (under the LEDL); and (5) awarding Mr. Greene all other legal and equitable relief to which plaintiff may be entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA
70448 Telephone: (504) 275-5149
Facsimile: (504) 910-1704
Email: vogeltanz@gmail.com

*Attorney for Bruce Greene*

**Clerk of Court: Please Hold Service While Plaintiff Attempts to Secure Waiver of Summons**

DocuSign Envelope ID: 0E78E6C0-210E-4FEB-AE97-A8313B44CFB7

# UNITED STATES DISTRICT COURT
## MIDDLE OF LOUISIANA

**BRUCE R. GREENE**

          **Plaintiff,**

    **v.**

**MAMMOET USA SOUTH, INC. AND
ANTHONY GARCIA**

          **Defendant.**

**CIVIL NO. PENDING**

## <u>DECLARATION OF BRUCE R. GREENE</u>

I, Bruce Greene, am over the age of 18 years, and declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing facts and true and correct to the best of my knowledge and recollection:

1.      I am the named plaintiff in the lawsuit *Greene v. Mammoet USA South Inc. et al.*, soon to be filed in the United States District Court for the Middle District of Louisiana.

2.      I authorized my attorney, Kevin S. Vogeltanz, to file the original Complaint in this matter.

3.      I verify that, at the time of its filing, each allegation of the Complaint was true and correct to the best of my knowledge and recollection.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.  Executed this February 26, 2021.

DocuSigned by:

*Bruce Greene*

78B0C1822ABE4F6...

Bruce R. Greene